IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 17, 2018 Session

## STATE OF TENNESSEE v. ADAM LEE IPOCK

**Appeal from the Circuit Court for Fentress County
No. 2016-CR-105    Shayne Sexton, Judge**

### No. M2017-01374-CCA-R3-CD

The defendant, Adam Lee Ipock, appeals his Fentress County Circuit Court jury convictions of vehicular assault, driving under the influence ("DUI"), and simple possession of methadone, claiming that he is entitled to a new trial because the trial court erred by permitting the State to question him about the facts underlying his prior convictions and that the charges of vehicular assault and DUI must be dismissed because the State relied on a blood toxicology report obtained in violation of his right to due process. The prosecutor improperly inquired into the facts underlying the defendant's prior convictions, and the error was not harmless when viewed in light of the evidence of the defendant's guilt of vehicular assault and DUI. In consequence, we affirm the defendant's conviction of simple possession but reverse the convictions of vehicular assault and DUI and remand those charges for a new trial.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed in Part; Reversed and Remanded in Part**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Evan M. Wright (on appeal), and Harold Deaton (at trial), Jamestown, Tennessee, for the appellant, Adam Lee Ipock.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Jared Effler, District Attorney General; and Phillip Kazee and Tessa Lunceford, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

Following a vehicle accident that caused the victim, Lonnie J. Cooper, to suffer serious bodily injuries, the Fentress County Grand Jury charged the defendant with one count of vehicular assault by intoxication; one count of DUI; one count of possession of methadone, a Schedule II controlled substance; and one count of possession of clonazepam, a Schedule IV controlled substance. Prior to trial, the State dismissed the count charging possession of clonazepam, and the case proceeded to trial on the remaining charges in March 2017.

At trial, Phyllis Ferrara testified that she and a friend were driving on highway 154 in Jamestown on June 20, 2016, when they came upon a vehicle accident involving a Dodge pickup truck being driven by the defendant and a vehicle being driven by the victim. The defendant was outside of the truck, but the victim was pinned inside his vehicle. Ms. Ferrara said that the victim was covered in blood and that the flesh of the victim's arm "was pretty wide open." Ms. Ferrara telephoned 9-1-1 while her friend went to offer assistance. Ms. Ferrara then saw the defendant lean into the driver's side window of his truck, "grab[] something," and then "walk[] across the street and kind of toss[] it into the bushes." The defendant then asked Ms. Ferrara if he could borrow her cellular telephone to call his father or grandfather. She described the defendant as "very upset" at that point.

After the defendant finished his call, Ms. Ferrara used her telephone to call the victim's daughter. When the police arrived, Ms. Ferrara told an officer that the defendant "pulled something out of the truck and he threw it in the bushes over there, you might want to check." She and her friend then left the scene.

Fentress County Sheriff's Office ("FCSO") Investigator Brandon Cooper testified that he responded to a call "of a[n] accident with injuries and also . . . information that there was possibly some narcotics or substances hid in the wood line there close to the scene." When he arrived at the scene, Investigator Cooper began looking in a briar patch approximately 100 feet from the crash scene. Within three to five minutes, he located "a bottle that contained" methadone. Investigator Cooper showed the bottle to the defendant "and asked him if they were his. He stated, yes. And I asked him why they were where they were at and he said that he had panicked and had . . . put them there."

Tennessee Highway Patrol ("THP") Trooper Jamie Stephens testified that he was dispatched to investigate an accident near the intersection of Highway 52 and Highway 154, also known as West Cove Road, in Fentress County. He said that when he arrived, the two vehicles were facing in opposite directions, and the victim's vehicle was

in the ditch. The defendant was "sitting close to a mailbox on a . . . culvert for a driveway," and the victim had already been transported to the hospital. Both vehicles bore damage to the left side, and the driver's side door of the victim's truck, a GMC Canyon pickup truck, "was kind of peeled apart, as you would say, the skin was peeled off the door." "[T]he left front wheel of [the defendant's] truck was turned sideways and the tire was busted off the vehicle." Trooper Stephens recalled that "the gouge marks which are caused from the frame of the vehicles when . . . they make contact were completely in the northbound lane," which led Trooper Stephens to conclude that the defendant's "vehicle was on the wrong side of the road" when the accident occurred.

At some point, the defendant "brought a chair and was sitting behind a minivan in a driveway that was nearby," which Trooper Stephens thought was odd, saying, "Normally, very seldom[], have I seen anybody sitting in a chair at an accident scene." Upon speaking with the defendant, Trooper Stephens observed that the defendant's "eyes were bloodshot," "his speech was slow and slurred," and "he appeared to be under the influence of something." Trooper Stephens did not attempt to conduct field sobriety tests because the terrain near the accident scene was not conducive to doing so. The defendant told Trooper Stephens that he had taken his prescription medication earlier that morning. Because he believed the defendant to be under the influence, Trooper Stephens asked the defendant to submit to a blood test, and the defendant agreed. He recalled that when he transported the defendant from the scene, the defendant was having difficulty remaining alert.

Trooper Stephens recalled that shortly after he arrived at the scene of the accident, FCSO officers gave him a prescription bottle they had located in nearby bushes. He said that the bottle bore a label indicating that it contained the medication "Plenazepam" prescribed to the defendant. The bottle actually contained "two different types of pills," and he submitted the pill that did not match the medication label to the Tennessee Bureau of Investigation for forensic testing. That testing established that the pill was methadone.

During cross-examination, Trooper Stephens said that "it didn't take long to determine" that the defendant was under the influence and that he came to suspect that the defendant had committed vehicular assault when he arrived at the hospital "and determined that [the victim] had been taken to the out-of-town hospital." Trooper Stephens said that his investigation indicated that the defendant had applied his brakes "right at the point of impact" and that, given the steep incline in the direction the victim was traveling, the victim would not have had to apply his brakes "[b]ecause if you let off the gas going up that hill, you're gonna stop." He stated that, at the point of impact, the defendant was four or five feet across the centerline.

Trooper Stephens agreed that he did not observe any signs that the defendant had consumed alcohol before the accident but reiterated that the defendant appeared to be intoxicated. Trooper Stephens acknowledged that he did not take any sort of measurements of the scene, explaining that he had not done so because he "was not informed that [the victim] was actually injured to the extent that he was." He said that he was told only that the victim had suffered a cut to his arm. Trooper Stephens said that he attempted to determine whether either driver had been wearing a seatbelt at the time of the accident and that he had concluded that the defendant had not been wearing his "because it was not locked." Others who responded to the accident before Trooper Stephens told him that the victim "did have [his seatbelt] on when they got to him."

TBI Agent and Forensic Scientist Samantha Engelhardt performed toxicology tests on the sample of the defendant's blood procured immediately after the accident. Her testing established that the defendant's blood contained clonazepam, phentermine, and methadone. She testified that both clonazepam and methadone were central nervous system depressants and that the combination of those two drugs "could have additive central nervous system effects." Phentermine is a central nervous system stimulant. She said that the amount of each drug in the defendant's system fell at or below the therapeutic range, which she described as "a typical blood level we would expect to see when someone is taking a dose that's prescribed, a typical daily dose prescribed by a doctor." Agent Engelhardt testified that, even in the therapeutic range, clonazepam and methadone could cause drowsiness, delayed reaction time, and an inability to "perform a divided attention task" such as driving. Phentermine, she said, could cause an inability to focus "depending on the dosage." She stated that any of the drugs could impair the ability to drive.

The victim testified that on June 20, 2016, he had just begun to ascend the steep incline on Highway 154 when he saw the defendant's "truck coming around the curve . . . and he was over just a little across the centerline." He said that he "wasn't going very fast at all" and that he "just got over as far as [he] could." The victim said that the defendant's truck "just kept getting over farther" and that, despite that the victim had driven "over next to the ditch line as far as [he] could go," the defendant's truck struck his truck head on. The victim said that he had begun to reduce his speed as soon as he saw the defendant drifting over the centerline and that, at the time of the impact, he was not "stopped, but . . . was real close."

The victim recalled that after the impact, the defendant came over to his truck, and the victim asked him to call 9-1-1. The victim recalled that a woman arrived shortly thereafter and told him that she had already called 9-1-1. The victim also asked the woman to contact his daughter, and she did so. He recalled that, at that point, he could see that he had "some bad cuts and tore places on [his] arm." He said that he was

-4-

initially transported to a local hospital but was thereafter airlifted to the University of Tennessee Medical Center ("UTMC") due to the severity of his injuries. The victim testified that he remained conscious throughout the entire ordeal until he was taken into the operating room for surgery at UTMC. He stated that he was placed on life support from the time he went into surgery until "sometime the next day." He then spent four or five days in the hospital until he talked doctors into releasing him. The victim described his injuries: "Well, to start from the top, I had two fractures in my neck, eight broke ribs, a punctured lung, and my left arm about tore off, my left leg broke and . . . a bone in my foot broke."

The parties stipulated that the victim had suffered serious bodily injuries in the crash:

1. Pneumothorax (collapsed lung);
2. Cervical Transverse Process Fracture (a break of one of the bones in the neck);
3. Multiple Rib Fractures;
4. Fracture of the Thoracic Transverse Process (a bony protrusion from the back of a vertebrae bone in the spine);
5. Left upper extremity complex lacerations with extensive tissue devitalization x 3; and
6. Left distal tibia/fibula fracture (break of the lower leg)[.]

The victim testified that, on the day of the accident, he had taken prescription oxycodone and morphine that had been prescribed to him for pain in his ankle, explaining that doctors planned to amputate his foot due to the condition of his foot and ankle.

During cross-examination, the victim said that his ankle problem stemmed from a prior injury and that the accident at issue in this case did not contribute to the issue. He said that, at the time of the crash, he took 30 milligrams of morphine and 15 milligrams of oxycodone every morning and evening; he took his medicine as prescribed at approximately 5:00 a.m. on the morning of the accident.

Doctor Glen Farr, who was certified by the court as an expert in the field of pharmacology, testified that clonazepam is a central nervous system depressant designed to "decrease the anxiety associated with the central nervous system" and that it is "a fairly commonly used drug to treat anxiety and seizures." He said that clonazepam "can cause drowsiness, confusion, incoordination, blurred vision, memory impairment or amnesia." Doctor Farr explained that even at therapeutic levels, clonazepam is designed to "caus[e] the patient to be relaxed and calm." He said that the level of clonazepam in

the defendant's blood, despite being within the therapeutic range, would cause some impairment "because therapeutic effects is what would cause impairment." Doctor Farr emphasized, however, that he could not quantify the effects of the drug on the defendant.

Doctor Farr testified that phentermine is a central nervous system stimulant designed to "make[] you feel too excited to eat, is basically what it does." He said that the amount of the drug in the defendant's system was "less than .05 . . . micrograms per milliliter" and that when a drug is reported at that level "[i]t could be almost zero or it could be .049." He said that there was no way to "make any firm conclusions about the effects" of the phentermine in the defendant's blood other than the fact that he had taken the drug prior to having his blood drawn.

Methadone, the doctor testified, is an opiate designed to relieve pain. He said that it is "used primarily as a substitute for Heroin, Oxycodone, those kinds of things" because "it's easier to withdraw someone from Methadone than it is from Oxycodone or Heroin." He said that methadone would produce similar side effects to clonazepam but warned that, because the amount reported in the defendant's system was less than .05 micrograms per milliliter, "we don't know enough to quantify the effects." He added that methadone has "a very long half-life, so it could have been taken days before, or it could have been taken just prior, and it hadn't even reached a level."

Doctor Farr testified that Trooper Stephens' observations of slurred speech, bloodshot eyes, and lethargy would have been consistent with the ingestion of clonazepam and methadone but not consistent with ingestion of phentermine. He agreed that the effects of those drugs could impair someone's ability to drive a motor vehicle.

During cross-examination, Doctor Farr opined that the effect of the small amount of phentermine and methadone in the defendant's blood was "not a clinically significant effect." He said that the effects occasioned by the amount of clonazepam would depend upon the dose and the regularity with which the defendant used the medication, but he said that "there would be some impairment at that level." He reiterated, "As I said, he would be impaired, the degree of which I can't quantify."

THP Critical Incident Response Team ("CIRT") Sergeant John McFarland, who was certified as an expert in accident reconstruction, testified that his team did not respond to the active crash scene in this case but went to the location of the accident on June 30, 2016. Trooper Stephens walked him through the scene "from one end to the other," and he "then photographed the scene in detail." Then, using a piece of equipment called "a total station," Sergeant McFarland created a scale map of the crash scene. After leaving the scene, he went to "a wrecker lot in Jamestown" to examine the victim's truck. He examined and photographed the truck and then used the total station to create "a

damage profile of the vehicle." Sergeant McFarland then traveled to a residence just outside of Jamestown to perform the same examination of the defendant's vehicle. He said that he was unable to examine the interior of the defendant's truck because it was locked.

Sergeant McFarland testified that, using the information gleaned during his investigation, he concluded that the defendant's failure to maintain his lane was the cause of the crash and that drug use was a possible contributing factor. He said that the defendant "crossed into the other lane . . . ultimately resulting in . . . a side-swipe collision." Sergeant McFarland opined that the victim bore no responsibility for the accident, explaining that, based upon his observations, the victim "was driving at a very low speed or almost stopped" when the defendant's truck struck his. Sergeant McFarland testified that the defendant's truck was at least five feet across the centerline at the point of impact.

During cross-examination, Sergeant McFarland testified that he attempted to contact the defendant by calling "the only number that" he had been given for the defendant. He said that a man answered, "and to say the least, . . . he was disrespectful . . . in his tone and how he" spoke to Sergeant McFarland after the sergeant identified himself. The person said that "they'd never heard of a Mr. Ipock," but Sergeant McFarland "thought that was very strange" and believed the defendant to be the person to whom he spoke.

Darren South, who was engaged to the defendant's mother, testified that, at the time of the accident, the defendant had been living with him and his fiancée on West Cove Road in Jamestown and that the truck the defendant wrecked belonged to him. He said that although the defendant had previously had an issue with drug use, he had agreed to loan the defendant his truck because "[h]e was doing a lot better and he was working and trying to make money to try to better himself." Mr. South recalled that he saw the defendant just before the accident and that the defendant did not appear impaired to him, saying, "If he was impaired, there was no way I'd let him leave my driveway in my vehicle, no." He said that the accident occurred "probably about 500 to 750 yards away" from his residence.

Mr. South testified that someone telephoned him to let him know that the defendant had been in an accident and that he immediately went to the scene. He said that when he arrived, the defendant "was stunned. He was sitting in the ditch line. He was just crying." Mr. South said that he did not observe any signs that the defendant was impaired at that time.

During cross-examination, Mr. South again acknowledged the defendant's prior issue with drug use and agreed that he and the defendant's mother had supported the defendant during that time.

The defendant testified that, at the time of the accident, he had been taking clonazepam for approximately six months "[f]or panic attacks" and that he had been taking "Xanax and other drugs for the last 12 to 15 year[s]." The defendant said that he had prescriptions for clonazepam and phentermine but did not have a prescription for methadone, which he had obtained from a friend. The defendant said that he had taken the clonazepam sometime between 8:00 and 10:00 p.m. the previous evening.

Asked to describe how the accident occurred, the defendant testified:

> I was going to get a Pepsi and I'd pulled out of the driveway and went, I guess, what they said south on West Cove road there, over towards the bluff. And as I shifted into third gear, I had my cell phone plugged in, the charger sitting on my console, and when I shifted into third gear, it jerked my cell phone cord and threw my phone into the floorboard. And as I leaned over . . . I started going into the other lane. As I grabbed my phone and come up, the only thing I saw was Mr. Cooper, like that, and that's it. And that's – I mean, I'd already hit him.

The defendant said that he was "absolutely not" impaired at the time of the accident and attributed Trooper Stephens' description of his having bloodshot eyes and slurred speech to the impact of the airbag, saying, "Getting hit in the face with an airbag's a pretty good lick." He explained that the impact of the airbag "busted [his] dentures," which impacted his ability to enunciate. The defendant added that he had "been crying from arguing with" Mr. South about the damage to the truck.

The defendant admitted that he put his medication bottle in the bushes and said that he did so because he knew that he did not have a prescription for the methadone and "panicked." The defendant did not deny causing the accident but denied having been impaired by drugs.

During cross-examination, the defendant acknowledged having previously suffered from an opiate addiction but said that he had stopped using illegal drugs in January 2016. The defendant insisted that he told Trooper Stephens that the accident happened when he reached for his cellular telephone.

-8-

The defendant admitted having pleaded guilty to theft of property valued at more than $1,000 and aggravated burglary for breaking into his grandparent's home and stealing from them.

The defendant's mother, Carol Ann Crabtree, testified that prior to becoming disabled, she worked as a nurse. Ms. Crabtree said that the defendant had struggled with drug addiction for more than 10 years and that, using her experience as a nurse and her general familiarity with the defendant, she had developed the ability to determine when the defendant was under the influence of drugs. Ms. Crabtree testified that the defendant began "getting some help from mental health" for his drug addiction in January or February of 2016. She recalled that, as part of his treatment plan, the defendant had been prescribed clonazepam, Seroquel, and Neurontin. She said that she maintained control of the defendant's prescription medications by locking them in a safe. She said that she provided the defendant with three clonazepam pills for the day. On the day of the crash, Ms. Crabtree "put three pills in his bottle and left them in [the] sitting room where he knew they was at, because everything else was locked up." When she returned from work at approximately 12:30 p.m., the defendant asked if he could use Mr. South's truck to go buy a Pepsi. At that point, the defendant "still had his medicine with him. He hadn't taken it." She insisted that the defendant was not impaired at that time.

Ms. Crabtree testified that as a young nurse, she "came upon a young man that had . . . been hit by a drunk driver and [she] had to be with him when he died." Additionally, her brother was struck and killed by a drunk driver while "sitting on a motorcycle at the side of the road." Because of these experiences, she said, she would not have allowed the defendant to drive a vehicle if she thought he was impaired, explaining, "I wouldn't have let him, never. Not only for the person that he could have killed, but he could have killed hisself. I would never have let him done it. No."

During cross-examination, Ms. Crabtree said that she locked the defendant's medication up because he asked her to do so. She said that she did not give him any medications other than the clonazepam, Seroquel, and Neurontin. Ms. Crabtree said that she was aware that the defendant had taken phentermine previously and that she did not control his access to that medication.

Based upon this evidence, the jury convicted the defendant of one count of vehicular assault, one count of DUI, and one count of possession of a Schedule II controlled substance. The trial court merged the DUI conviction into the conviction of vehicular assault, a Class D felony, and imposed a Range II sentence of eight years' incarceration. The trial court imposed a sentence of 11 months and 29 days for the defendant's conviction of simple possession of a Schedule II drug. The court ordered the

sentences to be served concurrently to each other but consecutively to the four-year effective sentence imposed in an unrelated case.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant contends that the "State poisoned the jury" by impermissibly inquiring into the details of the defendant's prior convictions during its cross-examination of him and by emphasizing those details during its closing argument. The defendant also claims entitlement to a new trial on grounds that the State used blood test results obtained via a process recently declared unconstitutional by this court. We consider each claim in turn.

*I. Defendant's Prior Convictions*

The defendant first asserts that the State impermissibly inquired into the facts underlying his prior convictions in violation of established principles of law and his right to a fair trial. Initially, the State contends that the defendant has waived plenary consideration of the issue of the admission of the underlying facts of his prior convictions because he failed to lodge a contemporaneous objection to the challenged statements during trial. The defendant asserts that he properly preserved the issue by filing a motion in limine regarding the use of his prior convictions and that the filing of that motion obviated the necessity of a contemporaneous objection. In the alternative, the defendant asserts that this court should review the issue for plain error.

"[W]he[n] the record on a pretrial suppression motion or on a motion in limine clearly presents an evidentiary question and whe[n] the trial judge has clearly and definitively ruled" on the motion, an objection when the challenged evidence is offered at trial is unnecessary to preserve the issue for appellate review. *State v. McGhee*, 746 S.W.2d 460, 462 (Tenn. 1988); *see also State v. Alder*, 71 S.W.3d 299, 302 (Tenn. Crim. App. 2001). When, however, "issues are only tentatively suggested or the record only partially and incompletely developed in connection with a motion in limine," the failure to lodge an objection during trial carries with it the risk that the issue has not been properly preserved. *McGhee*, 746 S.W.2d at 462.

In this case, the defendant filed two motions in limine related to the use of his prior criminal record, one citing Tennessee Rule of Evidence 609 and one citing Tennessee Rule of Evidence 404(b).[1] In both, the defendant asked the court to exclude

---

[1]     Neither party has suggested that the facts underlying the defendant's convictions would have been admissible pursuant to Tennessee Rule of Evidence 608(b). Although that rule generally allows the State to impeach a criminal defendant's credibility via inquiry into specific instances of past conduct that could be classified as criminal offenses, the rule remains that "acts that were a criminal offense and were the object of a criminal conviction must be introduced pursuant to Rule 609 rather than Rule 608. Rule

-10-

"any and all prior convictions of the defendant as being irrelevant to this case, and the probative value is substantially outweighed by the danger of unfair prejudice." Neither motion specifically asked the trial court to rule on the admissibility of the facts underlying the defendant's prior convictions. At the hearing on the defendant's motions, the State indicated that it did not intend to offer the defendant's prior convictions as part of its case in chief but did intend to utilize the defendant's prior convictions of aggravated burglary and theft to impeach the defendant should he elect to testify. Neither party indicated any intention to inquire into the specific facts underlying either conviction. The trial court found both convictions to be admissible to impeach the defendant.

At trial, during the cross-examination of the defendant,[2] the following exchange occurred:

> Q.   Okay. Well, let me ask you a question. I think that you were found guilty of theft over a thousand dollars and convicted of that from stealing from your grandmother, correct?
> A.   I pled guilty to that, yes.
> Q.   You pled guilty to stealing over a thousand dollars from your grandmother, correct?
> A.   Yes, sir.

---

609 covers criminal convictions for impeachment." Cohen, et. al., *Tennessee Law of Evidence* § 6.08[4] (6th ed. 2011); *see also, e.g.*, *State v. Shayne Thomas Hudson*, No. M2013-02714-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App. Nov. 21, 2014) ("We note that the language of Rule 608(b) specifically excludes criminal convictions, stating that the admissibility of such convictions is governed by Rule 609."). Moreover, the State did not comply with the notice requirement in that rule. *See* Tenn. R. Evid. 608(b)(3) ("If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conduct before trial, and the court upon request must determine that the conduct's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.").

[2]    In addition to the improper references to the facts underlying the defendant's prior convictions, the prosecutor's cross-examination of the defendant and the other defense witnesses might best be described as intemperate. At one point, the prosecutor asked Ms. Crabtree, "Are you seriously testifying to this, ma'am?" During the cross-examination of Mr. South, the prosecutor asked, "So, [the defendant] was a grown man, but he wasn't working, he was mooching off of you all?" When confronting the defendant about the absence of a cellular telephone listed on the inventory search of the truck he was driving, the prosecutor asked, "Where is the cell phone, sir? It's a fictitious defense to this crime; isn't it, sir?" It is improper for the prosecutor to use "insinuations and misstatements" or to engage in "bullying and arguing with witnesses." *Berger v. United States*, 295 U.S. 78, 85 (1935).

Q.      You also pled – which – and you also pled guilty to breaking in your grandmother's home to steal that money, correct?

A.      (No audible response)

Q.      Did you plead guilty to that?   Were you convicted, sir?

A.      Of what charge?

Q.      Of aggravated burglary?

A.      Yes.

Q.      Of the home of J.D. and Phyllis Ipock?

A.      Yes.

Q.      And who is that to you?

A.      My grandparents.

Q.      And so, we should believe somebody who breaks in his – his grandparents' home and steals money from them?

A.      Unfortunately, a drug addict has a lot of negative effects.

The defendant did not lodge a contemporaneous objection, but the trial court provided the following instruction to the jury:

If from the evidence presented you find that the defendant has been convicted of prior crimes, you can consider such only for the purpose of its effect, if any, on his credibility as a witness.  It cannot be considered by you as evidence of his guilt of the offense for which he is now on trial.

The State again referenced the defendant's prior convictions in its closing argument, noting, at the outset of the discussion of the defendant's testimony that he is a convicted felon.   Then, in rebuttal, the prosecutor specifically referred to the facts underlying the defendant's prior convictions and asked the jury to consider those facts when assessing the defendant's credibility:

And one of the things that you get to consider as a jury when you weigh the testimony of the defendant is the fact that he was recently convicted of two felonies.  The first felony being aggravated burglary where the defendant broke in to his grandparents' home to obtain goods, possession or money.

-12-

And the second felony that he was convicted of was theft over $1,000 where he stole $1,450 in cash from his grandparents.

Now, is this the testimony that we think is credible? I suggest to you, no. I suggest to you that Adam Ipock, and I take no pleasure in telling you this, is a drug addict, a continuing drug addict, and a thief. And he is not to be believed. His testimony is not credible and you should not rely on that.

Tennessee Rule of Evidence 609 governs the use of prior convictions to impeach the accused in a criminal trial:

(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime may be admitted if the following procedures and conditions are satisfied:

(1) The witness must be asked about the conviction on cross-examination. If the witness denies having been convicted, the conviction may be established by public record. If the witness denies being the person named in the public record, identity may be established by other evidence.

(2) The crime must be punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement.

(3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

-13-

Tenn. R. Evid. 609. It is well settled and oft repeated that the inquiry into an accused's prior convictions "must be limited to the fact of a former conviction and of what crime, with the object only of affecting the credibility of the witness, not prejudicing the minds of the jury as to the guilt of the defendant witness of the crime for which he is on trial." *Hendricks v. State*, 39 S.W.2d 580, 581 (Tenn. 1931). Our supreme court reiterated this rule in *State v. Morgan*, stating that "[i]f it is determined that the prior crime is within the admissible category, the inquiry in the presence of the jury," is strictly limited to the fact of the conviction. *State v. Morgan*, 541 S.W.2d 385, 389 (Tenn. 1976) (citing *Hendricks*, 39 S.W.2d at 581); *see also* Cohen, et al., *Tennessee Law of Evidence* § 6.09[11][f] (6th ed. 2011) (stating that "[i]f a criminal conviction is used to impeach under Rule 609, counsel can ask about the date and fact of the conviction and the nature of the crime, but is precluded from inquiring about details of the offense"); *see also, e.g., State v. Glenn McPherson*, No. 104, 1990 WL 4636, at *2 (Tenn. Crim. App., Knoxville, Jan. 26, 1990) ("The clear purpose of Rule 609 and *Morgan* is to eliminate (ideally), or to reduce (realistically), the chance that a juror will consider the prior conviction as evidence of defendant's guilt in the case on trial. Ancillary to that purpose, Rule 609 and *Morgan* operate to prevent the jury from exposure to the details of the prior crime."). Following the adoption of Rule 609, our supreme court again emphasized that "'evidence' of a prior conviction admissible under Rule 609(a) is limited to the fact of a former conviction and the crime that was committed." *State v. Taylor*, 993 S.W.2d 33, 34 (Tenn. 1999).

Although the defendant should have objected when the prosecutor asked the defendant about the facts of his prior convictions and again when the prosecutor referenced those facts during his closing argument, we are unwilling to find waiver in this case. The defendant moved to exclude the convictions prior to trial, and the trial court ruled that the convictions would be admissible. Because the rule prohibiting inquiry into the facts underlying an accused's prior convictions is so well settled, the defendant could not have anticipated when filing his motions in limine that the prosecutor would make such an inquiry. Moreover, even if the defendant waived the issue by failing to lodge objections during trial, we conclude that the error qualifies as plain.

Whether properly assigned or not, this court may, "[w]hen necessary to do substantial justice, . . . consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial," Tenn. R. App. P. 36(b). This court will grant relief for plain error pursuant to Rule 36(b) only when:

> "(1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the

complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake."

*State v. Cooper*, 321 S.W.3d 501, 506 (Tenn. 2010) (quoting *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010)).

Here, the record clearly establishes what happened in the trial court and that a clear and unequivocal rule of law was breached. The defendant moved the trial court to rule on the admissibility of his prior convictions prior to trial, and the trial court ruled that the defendant's previous convictions of theft and burglary would be admissible should the defendant choose to testify. This ruling was correct. During trial, however, the prosecutor violated long-standing precedent by inquiring into the facts underlying those convictions. *See, e.g., State v. Blevins*, 968 S.W.2d 888, 894 (Tenn. Crim. App. 1997) ("[T]o the extent that the question was for the purpose of eliciting underlying facts of the former convictions, it was improper.").

The record contains no suggestion that the defendant's failure to object was for tactical purposes.

The record establishes that a substantial right of the defendant, namely his right to testify on his own behalf and have his credibility judged pursuant to the established rules of evidence, was adversely affected.

Finally, because the error cannot be classified as harmless, substantial justice is at stake. To evaluate the harmful effect of the error in this case, we must "consider the 'theory of the defense in order to determine whether the erroneous impeachment would have had an impact on the result of the trial.'" *State v. Lankford*, 298 S.W.3d 176, 182-83 (Tenn. Crim. App. 2008) (quoting *State v. Thompson*, 36 S.W.3d 102, 112 (Tenn. Crim. App. 2000) (citation omitted by *Lankford*) (internal quotation marks omitted)). The defendant admitted that he caused the accident but attributed the accident to his attempting to retrieve his cellular telephone from the floor. He also admitted having ingested clonazepam on the night before the accident, but he denied having been impaired at the time of the accident. The proof of the defendant's impairment, though sufficient to support his convictions when viewed under the appropriate standard of review, was not overwhelming. TBI testing established the presence of three drugs in the defendant's system, but the State's own expert testified that the amount of methadone and phentermine in the defendant's blood was "clinically" insignificant. Additionally, the amount of clonazepam in the defendant's blood was within the therapeutic range. Under these circumstances, the defendant's credibility was

-15-

of paramount importance in this case.[3]  Indeed, the State itself repeatedly emphasized the importance of credibility.  In consequence, the prosecutor's error in this case, as indicated, cannot be classified as harmless.  *See State v. Mixon*, 983 S.W.2d 661, 675 (Tenn. 1999) ("Unlike other situations in which the improper use of an impeaching conviction has been held to constitute harmless error, the evidence of guilt in this case is not overwhelming and the State emphasized the conviction to the jurors when urging them to find the defendant guilty.").  Accordingly, we reverse the defendant's convictions of vehicular assault and DUI and remand those counts for a new trial.[4]

## II.  Impact of State v. Decosimo

The defendant next contends that the State committed plain error by relying on a blood toxicology report obtained via a statute deemed unconstitutional by this court. In *State v. Rosemary Decosimo*, this court examined the fee system in Code section 55-10-413(f)[5] and concluded that it violated principles of due process.  *State v. Rosemary*

---

[3]     Code section 55-10-401, as applicable to this case, provides:

> It is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state . . . while:
>
> (1) Under the influence of any . . . controlled substance, controlled substance analogue, drug, substance affecting the central nervous system, or combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of oneself that the driver would otherwise possess[.]

T.C.A. § 55-10-401(1).

[4]     Our ruling does not impact the defendant's conviction of simple possession because the proof of that offense was overwhelming.  The record establishes that the defendant had methadone in his possession, and he candidly admitted that he possessed methadone that he had obtained from a friend.

[5]     At the time of the offense and forensic testing in this case, Code section 55-10-413(f) provided:

> In addition to all other fines, fees, costs and punishments now prescribed by law, including the fee imposed pursuant to subsection (d), a blood alcohol or drug concentration test (BADT) fee in the amount of two hundred fifty dollars ($250) shall be assessed upon a conviction for a violation of § 39-13-106, § 39-13-213(a)(2), § 39-13-218, § 39-17-418, § 55-10-205 or § 55-10-401, for each offender who has taken a breath alcohol test on an evidential breath testing unit provided, maintained and administered by a law enforcement agency for the purpose of determining the breath alcohol content or has submitted to a chemical test to determine the alcohol or drug content of the blood or urine.

*Decosimo*, No. E2017-00696-CCA-R3-CD, slip op. at 27 (Tenn. Crim. App., Knoxville, Feb. 6, 2018), *overruled by State v. Decosimo*, __ S.W.3d __, No. E2017-00696-SC-R11-CD (Tenn. Aug. 23, 2018). We held that even though TBI forensic scientists did not qualify as judicial or quasi-judicial officers under the test originally established in *Tumey v. Ohio*, 273 U.S. 510, 522 (1927), *see Rosemary Decosimo*, slip op. at 22, an "inherent conflict" existed "between the requirement that a forensic scientist be neutral and objective and Code section 55-10-413, which deposits the monies received from" forensic blood testing for the presence of drugs and alcohol "directly to the TBI, rather than the State general fund." *Id.*, slip op. at 23. We observed that Code section 55-10-413(f) "create[d] a mechanism whereby the TBI forensic scientists have a pecuniary interest in BADT fees in the form of continued employment, salaries, equipment, and

---

(2) The fee authorized in subdivision (f)(1) shall be collected by the clerks of the various courts of the counties and forwarded to the state treasurer on a monthly basis for deposit in the Tennessee bureau of investigation (TBI) toxicology unit intoxicant testing fund created as provided in subdivision (f)(3), and designated for exclusive use by the TBI for the purposes set out in subdivision (f)(3).

(3) There is created a fund within the treasury of the state, to be known as the TBI toxicology unit intoxicant testing fund.

(A) Moneys shall be deposited to the fund pursuant to subdivision (f)(2), and as may be otherwise provided by law, and shall be invested pursuant to § 9-4-603. Moneys in the fund shall not revert to the general fund of the state, but shall remain available for appropriation to the Tennessee bureau of investigation, as determined by the general assembly.

(B) Moneys in the TBI toxicology unit intoxicant testing fund and available federal funds, to the extent permitted by federal law and regulation, shall be used to fund a forensic scientist position in each of the three (3) bureau crime laboratories, to employ forensic scientists to fill these positions, and to purchase equipment and supplies, pay for the education, training and scientific development of employees, or for any other purpose so as to allow the bureau to operate in a more efficient and expeditious manner. To the extent that additional funds are available, these funds shall be used to employ personnel, purchase equipment and supplies, pay for the education, training and scientific development of employees, or for any other purpose so as to allow the bureau to operate in a more efficient and expeditious manner.

---

Tenn. Code Ann. § 55-10-413(f).

training within the TBI," and that this mechanism "calls into question the trustworthiness of the TBI forensic scientists' test results." *Id.*, slip op. at 28.

Recently, however, our supreme court overturned the ruling of this court, holding that the Code section 55-10-413(f) fee system did not deprive "the defendant of due process guaranteed by both the federal and the state constitutions." *Decosimo*, __ S.W.3d at __, slip op. at 26. The high court agreed with this court that "TBI forensic scientists do not exercise judicial or quasi-judicial functions," *id.* __ S.W.3d at __, slip op. at 19, but it concluded, contrary to the conclusions of this court, that the "fee statute does not provide TBI forensic scientists with either a direct, personal, substantial pecuniary interest or a sufficiently substantial institutional financial incentive that qualifies as a possible temptation to any reasonable forensic scientist to falsify or alter test results to produce more convictions" and "does not create a situation comparable to an expert witness contingency fee arrangement," *id.*, __ S.W.3d at __, slip op. at 26.

Given the supreme court's decision in *Decosimo*, the defendant can neither prevail upon the merits of his claim nor establish entitlement to plain error review in this case.

*Conclusion*

The prosecutor erred by inquiring into the facts underlying the defendant's prior convictions and then compounded the error by utilizing those facts during closing argument. Because the error cannot be classified as harmless as to the defendant's convictions of vehicular assault and DUI, we reverse those convictions and remand them for a new trial. We affirm the defendant's conviction of simple possession.

_____
JAMES CURWOOD WITT, JR., JUDGE